# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

LISA MARIE HILL

        Plaintiff,

vs.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

No. 18-cv-15-MAR

**ORDER**

---

Plaintiff, Lisa Marie Hill ("Claimant"), seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability and supplemental insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34.  Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled.  For the reasons that follow, the ALJ's decision is reversed and the case is remanded for reconsideration consistent with this Order.

## I.    BACKGROUND

I adopt the Parties' Joint Statement of Facts (Doc. 13) and therefore only summarize them here.  This is an appeal from a denial of a request for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits.  Claimant was born on August 10, 1967.  (AR[1] at 194.)  She has a GED and attended some college. (*Id.* at 35.)  Claimant alleges she has been disabled since January 4, 2013 due to anxiety, depression, and post-traumatic stress disorder ("PTSD") that is the result of childhood

---

[1] AR cites refer to pages of the Administrative Record.

abuse. (Doc. 13 ¶ 1.) She filed her initial claim on November 20, 2014. (*Id.*) Claimant was initially denied benefits on January 15, 2015. (AR at 106.) Claimant filed for reconsideration on January 29, 2015 and was again denied on April 3, 2015. (*Id.* at 111, 115-18.) Claimant filed a Request for Hearing on May 27, 2015. A video hearing was held on February 6, 2017 with Claimant and her counsel in Cedar Rapids, Iowa and ALJ Janice E. Barnes-Williams and a vocational expert in Kansas City, Missouri. (*Id.* at 29-55, 121.)

The ALJ issued her decision denying Claimant benefits on March 1, 2017. (*Id.* at 12-28.) On May 4, 2017, Claimant filed a Request for the Appeals Council to review the ALJ's decision. (*Id.* at 193, 292-95.) On November 27, 2017, the Appeals Council found there was no reason to review the ALJ's decision. (*Id.* at 1-9.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On January 19, 2018, Claimant timely filed the instant complaint in this Court. (Doc. 3.) On February 16, 2018, the Parties consented to have the case decided by a Magistrate Judge. (Doc. 7.) The case was originally assigned to the Honorable C.J. Williams and was reassigned to me on September 17, 2018. On December 18, 2018, the case was fully submitted and ready for decision.

## II. DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot,
> considering [the claimant's] age, education, and work experience, engage
> in any other kind of substantial gainful work which exists . . . in significant

numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  A claimant is not disabled if the claimant is able to do work that exists in the national economy, but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations.  *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).  At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy.  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity."  *Id.*  If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation."  *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled.  *Id.*  An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities."  *Id.* § 416.920(c).  The ability to do basic work activities means the ability and aptitude necessary to perform most jobs.  These include

(1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to the claimant's application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work

the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.     The ALJ'S Findings

The ALJ made the following findings at each step with regard to Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since January 4, 2013, the alleged onset date of disability. (AR at 17.)

At step two, the ALJ found that Claimant had the following severe impairments: generalized anxiety disorder, major depressive disorder, and post-traumatic stress disorder. (*Id.*) In addition, the ALJ found that Claimant had some non-severe impairments including obesity, arthritis, and headaches, but that those impairments were controlled by medications. (*Id.* at 17-18.)

At step three, the ALJ found that none of Claimant's impairments met or equaled a presumptively disabling impairment in the listings. (*Id.* at 18.) Specifically, the ALJ considered the "paragraph B criteria" and "paragraph C criteria" of two broad categories of mental disorders, listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). (*Id.* at 18-19.)

At step four, the ALJ found Claimant was unable to perform any past relevant work, but had the RFC to perform a full range of work at all exertional levels, but with the following nonexertional limitations:

> limited to simple, routine and repetitive tasks, which may require detailed instructions but do not involve complex tasks; in a work environment free of fast paced production requirements; involving only simple, work-related decisions; with few, if any, work place changes; no work involving public

interaction; can work around co-workers but with only occasional interaction with co-workers and supervisors.

(*Id.* at 19.)

At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could still perform with her RFC, including order filler, assembler, and production helper. (*Id.* at 23.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.*)

**B.    *The Substantial Evidence Standard***

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*,

349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

### C. Duty to Develop the Record

The administrative hearing is a non-adversarial proceeding, and the ALJ has a duty to "fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). Because the ALJ has no interest in denying Social Security benefits, the ALJ must act neutrally in developing the record. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971); *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994) (opining that "[t]he goals of the [ALJ] and the advocates should be the same: that deserving claimants who apply for benefits receive justice") (quoting *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir.1988)) (bracketed information added) .

## III.   DISCUSSION

Claimant alleges that remand is necessary for the following reasons: (1) the ALJ failed to properly address whether Claimant satisfied the requirements of Listings 12.04 and 12.06(B) and (C); (2) the ALJ improperly evaluated her treating psychiatrist's opinion; and (3) the ALJ improperly evaluated Claimant's subjective complaints. (Docs. 21, 27.)

After conducting a thorough review of the administrative record, the Court finds that the ALJ did not err at steps 1 and 2 of the five-step evaluation process. The Court will address each of Claimant's arguments, in turn.

### A.    The claim must be remanded to properly assess at step 3 whether Claimant satisfies the requirements of listings 12.04 and 12.06 (B) and (C).

Claimant bases her disability claim on two mental disorders, depression under listing 12.04 and anxiety under listing 12.06. The ALJ found at step 3 that none of

Claimant's impairments met or equaled a presumptively disabling impairment in the listings. (AR at 18.)

### i. *Paragraph B Criteria*

To meet the paragraph B criteria, Claimant's impairments have to result in an "extreme limitation in one, or marked limitation of two, [paragraph B criteria] of mental functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2). The paragraph B criteria are (1) Understand, remember, or apply information; (2) Interact with others; (3) Concentrate, persist, or maintain pace; and (4) Adapt or manage oneself. *Id.* § 12.00(E). Claimant makes arguments related only to her ability to interact with others. Accordingly, for Claimant to prevail regarding the paragraph B criteria, her limitations must be extreme on the five-point scale of limitations.[2] *Id.* § 12.00(F)(2)(e). An extreme limitation means that a claimant is unable to interact with others "independently, appropriately, effectively, and on a sustained basis." *Id.*

The "interact with others" area of mental functioning refers to a claimant's ability to "relate to and work with supervisors, co-workers, and the public." *Id.* § 12.00(E)(2). Examples include, among other things, "cooperating with others . . .; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues. . .; responding to requests, suggestions,

---

[2] The five-point scale follows:
  a. No limitation (or none). You are able to function in this area independently, appropriately, effectively, and on a sustained basis.
  b. Mild limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.
  c. Moderate limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.
  d. Marked limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.
  e. Extreme limitation. You are not able to function in this area independently, appropriately, effectively, and on a sustained basis.
20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2).

criticism, correction, and challenges; and keeping social interactions free of excessive [] sensitivity . . . or suspiciousness." *Id.*

In relevant part, the ALJ found that Claimant had moderate limitations in interacting with others, which was evidenced by Claimant's tendency to isolate from others; her terror of being around strangers; her commitment to shopping during the day only when absolutely necessary, preferring to shop at night when there are fewer people around; and belonging to no social groups or clubs. (AR at 18.) The ALJ offset these limitations with the fact that Claimant is in a long-term relationship and that she maintains contact with her children via computer and text messages. (*Id.*)

Claimant argues that the ALJ's support for her decision is misplaced because an ability to maintain a long-term relationship with her boyfriend and an ability to send emails and text messages to her children while in a supportive home environment "with tolerant family members, and with the flexibility to stay in her room when she does not feel like interacting" is irrelevant to Claimant's abilities to "relate and work with supervisors, co-workers, and the public" and a "determination of employment functionality" because Claimant can control "the manner and time" in which she wants to send emails. (Docs. 21 at 8; 27 at 2.) Specifically, Claimant argues that the ALJ failed to consider information in the record that is more relevant to Claimant's ability to work than is her ability to maintain relationships with her family members and boyfriend.

Claimant also avers that the ALJ selectively chose statements from the observations of her treating psychiatrist, Dr. Kija Weldon, instead of considering all the medical evidence as required by the Rules. (Doc. 27 at 4) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2)(a)(i)(j) ("We will consider all relevant medical evidence about your disorder [including]. . . .Your reported symptoms. . . ; Your clinical course, including changes in your medication . . . and the time required for therapeutic effectiveness; [and] . . . Observations and descriptions of how you function during

examinations or therapy.")  Specifically, Claimant takes issue with the Commissioner's reliance on Claimant's ability to be cooperative with her psychiatrist and psychologist and have normal speech and eye contact during those appointments, noting that the records the Commissioner cites also contain evidence and clinical notes that support Claimant's claim that she is unable to interact successfully in public and with people outside her family.  (Doc. 27 at 4) (*citing* Doc. 22 at 6.)

The record documents Claimant's difficulties interacting with other people, even sometimes members of her family.  (AR at 41-42, 240, 335, 359, 375-76.)  The record also documents Claimant's terror of being around people; anxiety attacks when in public; avoidance of crowds; lower anxiety when she is at home, and Claimant's discussion of these issues with Dr. Weldon, and her psychologist, Christine Rogers Cork.  (*Id.* at 38, 231, 239, 319, 320, 359-62, 366-68, 374, 376, 378, 380, 383.)

Dr. Weldon also noted that during her meetings with Claimant, Claimant was occasionally "fidgety," "tearful," or "slow" in her psychomotor activities[3] (*Id.* at 320, 324, 359, 361); sometimes disheveled in her appearance (*Id.* at 335, 359, 361, 362, 363, 365, 374, 378); and had a restricted affect[4] (*Id.* at 334, 335, 359, 361, 362, 364-68, 374, 376).

The Commissioner responds that despite having anxiety and depression, Claimant was able to discuss ways to set boundaries with her daughter when that was an issue and to successfully implement strategies learned in therapy, which the Commissioner argues reflects her ability to state her point of view and handle conflict.  (*citing id.* at 330, 369,

---

[3] Psychomotor relates "to the psychological processes associated with muscular movement and to the production of voluntary movements." *Stedman's Medical Dictionary* 1596 (28th ed. 2006).
[4] A "restricted affect" is "a reduction in the intensity of affect, to a somewhat lesser degree than is characteristic of a blunted affect." *Durland's Illustrated Medical Dictionary* 35  (32nd ed. 2012).  A "blunted affect" is a "severe reduction in the intensity of affect; seen in schizophrenic disorders, frontotemporal dementia, and certain other conditions." *Id.*

380.) The Commissioner also notes that Claimant enjoyed a trip to Las Vegas in January 2015 and a night out in March 2015, both with her boyfriend. (*Id.* at 21, 331, 381.) In addition, the Commissioner argues that Claimant was able to work for years outside the home with both her conditions until she left her job in 2013 to help her daughter, who was having a difficult pregnancy. (*Id.* at 221, 323.)

The Court finds that one page cited by the Commissioner says that Claimant was able to set boundaries with her daughter. (*Id.* at 380.) The other two cited pages say Claimant and her healthcare providers discussed setting boundaries. (*Id.* at 330, 369.) However, Claimant's boundary-setting success was apparently short-lived because three, seven, and eight months later, Dr. Weldon listed "daughter" as a stressor in Claimant's life. (*Id.* at 366, 367, 374.) Nine and twelve months after apparently setting boundaries, Claimant and Dr. Weldon discussed her stressful relationship with her daughter, ways to handle their disputes, and ways to improve her "command." (*Id.* at 363, 365.) In September 2016, Dr. Weldon again listed "daughter" as a stressor in Claimant's life. (*Id.* at 359.) Therefore, in spite of seemingly setting boundaries one month, Claimant was apparently unable to maintain those boundaries and stress was a continuing feature of her relationship with her daughter.

In addition, while the record indicates that Claimant enjoyed her time in Las Vegas, it also shows she was so nervous before the trip that she needed medications to get on the plane and that the trip exacerbated her mental health symptoms to the point that she needed to change medications when she returned home. (*Id.* at 318-19, 335.) Moreover, Claimant was with her boyfriend on this trip. Enjoying time away with a trusted loved one is different from going to work alone every day and is also consistent with Claimant's claim that she lives in a structured environment where her boyfriend and daughter try to limit times that Claimant has to leave the house alone. The trip to Las

Vegas in January 2015 was the first and last vacation Claimant took since her alleged onset of disability date.

The Court finds the Commissioner's reliance on a single trip over two years before the hearing misplaced because this reliance ignores the bulk of the evidence in the record that Claimant does not leave her home for fear of having to deal with strangers. She isolates herself at home and, other than the Las Vegas trip and the one date night in March 2015, the record demonstrates that the only other times Claimant leaves the house are to go to the doctor or grocery shop, something she tries to do after midnight when the crowds are smaller. (*Id.* at 40.) Dr. Weldon stated that Claimant suffers anxiety about even attending her doctor appointments during the day. (*Id.* at 383.) The record is replete with doctor notes regarding Claimant's anxieties about interacting with the public; Claimant is even fidgety and nervous during some of her appointments with Dr. Weldon. She was so nervous during the administrative hearing for this case that her leg was shaking up and down uncontrollably. (*Id.* at 39.)

Thus, in spite of the two instances cited by the Commissioner wherein Claimant dealt with the outside world, the record as a whole indicates that Claimant is isolated, fearful, unable to interact with the public, and incapable of exerting herself in a meaningful way that has any lasting consequences. This case is similar to *Yawitz v. Weinberger*. In *Yawitz*, the Eighth Circuit reversed the decision of the ALJ determining that the claimant was not disabled and could engage in substantial gainful activity. 498 F.2d 956, 961 (8th Cir. 1974). The ALJ in *Yawitz* only relied on evidence that the claimant drove and went on occasional camping trips in a camper bus he was restoring himself, while "totally ignor[ing]" the bulk of evidence concerning the limited amount of driving the claimant actually did; the frequent number of days the claimant and his wife could not travel due to claimant's severe migraines; that the claimant only worked around his house and on his camper on the days when he felt well enough to do so; and that there

were frequent days when the claimant could not do anything but sit in a dark room.  *Id.* at 960.

Finally, the Commissioner argues that in spite of having anxiety and depression, Claimant was able to work for years.  Claimant's work record indicates that most of her work was sporadic or part-time, and that for the 15 relevant years, Claimant made only enough money for her employment to count as "substantial gainful activity" for the years 2000 and 2006.  She was just short of substantial gainful activity in 2007.  (AR at 215.) "Substantial gainful activity" is based on a monthly income rate that changes every year.[5] The Court finds this spotty employment record does not demonstrate Claimant's ability to work despite her mental health problems.  This history does not support a finding Claimant can currently work fulltime because Claimant's problems have deteriorated since 2013.  (*Id.* at 39, 236, 246.)

In conclusion, the Court finds that the ALJ failed to conduct a proper review of the entire record, and that such a review may have yielded a different conclusion on the paragraph B criteria.   The ALJ ignored the clinical records, testimony, and a third-party statement that Claimant has been basically housebound since 2015, except for doctor appointments, midnight grocery shopping trips, and the occasional daytime "emergency" grocery shopping trip.  Therefore, the Court finds that remand is necessary for the ALJ to properly weigh evidence in the record related to this issue.

### ii.  *Paragraph C Criteria*

To meet the "paragraph C criteria," Claimant must have a mental disorder that is "serious and persistent."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(G)(1).  A mental disorder is "serious and persistent" when it is medically documented to have continued

---

[5]  *See*  Social   Security   Administration,   Substantial   Gainful   Activity, https://www.ssa.gov/oact/cola/sga.html.  The Court's calculation used the relevant monthly rate to calculate the annual substantial gainful activity for each year.

over a period of at least two years, and the evidence shows that the disorder satisfies both C1 and C2 criteria. *Id.* at § 12.00(G)(2)(a).

The ALJ's entire discussion of the paragraph C criteria stated, "I have considered whether the 'paragraph C' criteria are satisfied. In this case, the evidence fails to establish the presence of the 'paragraph C' criteria." (AR at 19.)

In addition to the duty to fully develop the record, the ALJ must adequately explain her factual findings in order to permit the Court to determine whether substantial evidence supports the decision. *See Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008) (citing *Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir.2005); *Pettit v. Apfel*, 218 F.3d 901, 903–04 (8th Cir. 2000)). It follows that in cases where the ALJ's factual findings are insufficient for meaningful appellate review, remand is appropriate. *Chunn*, 397 F.3d at 672.

However, the Eighth Circuit has consistently held that where the record supports the overall determination, an ALJ's failure to adequately explain her factual findings is not sufficient reason to set aside that administrative finding. *Scott*, 529 F.3d at 822 (quotation omitted). Where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit the Court to conclude that substantial evidence supports the Commissioner's decision, remand is appropriate. *Id.* Therefore, the Court must review the entire record to decide if it supports the ALJ's decision.

Claimant argues that the ALJ's decision on paragraph C is insufficient to allow the Court to conduct a meaningful appellate review. The Commissioner does not address whether the ALJ's decision allows for meaningful review, opting instead to argue why Claimant's impairments do not satisfy the paragraph C criteria. (Doc. 22 at 7-10.)

The Court first finds that the ALJ failed to adequately explain her factual findings to an extent that allows the Court to determine what substantial evidence supports her decision that "the evidence fails to establish the presence of the 'paragraph C' criteria."

What follows is an independent review to determine if the record supports a finding that the paragraph C criteria are not satisfied.

### a. *"Serious and Persistent" Mental Disorder*

The Commissioner does not dispute that Claimant has a serious and persistent mental disorder and the Court finds that Claimant satisfies this requirement. She began treatment with Dr. Weldon on October 10, 2014 and the record contains regular treatment notes through November 17, 2016. (AR at 318, 320-25, 334-35, 358-68, 370, 372, 374, 376, 378, 380.) Claimant was still seeing Dr. Weldon at the time of her administrative hearing on February 6, 2017. (*Id.* at 44.)

### b. *C1 Criteria*

The C1 criteria are satisfied when the evidence shows that a claimant relies on medical treatment, support, or a highly structured setting that is ongoing "to diminish the signs and symptoms of [the] mental disorder." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(G)(2)(b). A claimant receives "ongoing medical treatment" when the medical evidence establishes that she obtains "medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for [the claimant's] medical condition." *Id.* The Commissioner argues that Claimant does not meet the C1 criteria because she did not seek treatment for more than a year after her alleged onset date of disability.

Claimant does not deny that she did not seek treatment for her symptoms until more than a year after her alleged onset date of disability. However, the Court finds that this failure to seek treatment is not a sign of lack of a serious and persistent mental disorder. Rather, this was the result of Claimant not having medical insurance at any time in her adult life until autumn 2014. (AR at 311.) A lack of evidence of being denied free medical care can undermine a claimant's argument based on lack of medical insurance. *See Goff v. Barnhardt*, 421 F.3d 785, 793 (8th Cir. 2005). Here, however,

the record reveals that Claimant did not receive *any* regular medical care for at least 20 years prior to 2014. (AR at 311.) Therefore, the Court does not find that Claimant "manufactured" a mental illness that would logically have been addressed in the past, which bolsters Claimant's credibility on this issue. On the contrary, Claimant seems to have sought out both physical and mental health care as soon as she obtained insurance. (*Id.*)

In addition, the Commissioner argues that Claimant did not seek continuous treatment because Claimant treated with psychologist Ms. Rogers Cork for less than one year. (Doc. 22 at 8.) However, the record documents that Claimant saw her treating psychiatrist Dr. Kija Weldon 23 times between October 10, 2014 and November 17, 2016.[6] (AR at 318, 320-25, 334-35, 358-68, 370, 372, 374, 376, 378, 380.) Moreover, the Commissioner does not take issue with Claimant's citations to the British National Institute of Health and the Institute of Medicine of the National Academies for Treatment for Posttraumatic Stress Disorder in Military and Veteran Populations regarding the appropriate frequency of treatment visits. (*see* Doc. 21 at 10 n.1). More importantly, Dr. Weldon's own treatment notes established this schedule as the efficacious treatment frequency for Claimant. (AR at 325) (recommending follow up in "three to four weeks or sooner if needed").

Moreover, the Court finds that Claimant relies on a highly restricted living situation to diminish the signs and symptoms of her mental disorder. The record demonstrates that Claimant rarely leaves the house, and then only at night, unless she can absolutely avoid it. (*Id.* at 38-40.) While she does drive herself to her medical appointments, Dr. Weldon opined that this task is so difficult for Claimant that "it has been a struggle for her to tolerate the anxiety she experiences when coming to

---

[6] As discussed above, Claimant continued to see Dr. Weldon at least through February 6, 2017.

appointments once a month." (*Id.* at 383.) Claimant schedules these appointments in the evening. (*Id.* at 44.) Claimant's daughter tries to help her with her anxiety in public places, but it still takes a long time to get through a store because of Claimant's fear. (*Id.* at 242.)

The ALJ did not explain why she found that the paragraph C criteria were not satisfied. She did give the assessments of the Social Security Administration's non-examining reviewers, Scott Schafer, Ph.D. and Jonathon Brandon, Ph.D. ("the reviewers") significant weight. (*Id.* at 21.) Dr. Schafer issued an assessment on January 15, 2015. (*Id.* at 71-80.) Dr. Brandon issued an assessment on April 1, 2015 affirming and adopting Dr. Schafer's assessment in conjunction with Claimant's appeal of her denial of benefits. (*Id.* at 100.) Therefore, the two assessments are almost identical.[7]

The reviewers opined that medication "helps to control" Claimant's anxiety and depression. "[A]lthough [Claimant] may have some problems with extended periods of concentration," she is able to "think and act in [her] own best interest," follow simple instructions, and complete assigned tasks. (*Id.* at 68, 78.) They also stated that Claimant's abilities to do the following were moderately limited:

- interact appropriately with the public;
- ask simple questions or request assistance;
- accept instructions;
- respond appropriately to criticism from supervisors; and
- respond to changes in a work setting.

(*Id.* at 74-75.) The reviewers also found that Claimant's abilities to do the following were not significantly limited:

- get along with coworkers or peers without distracting them or exhibiting behavioral extremes;
- maintain socially appropriate behavior;

---

[7] The only new evidence Dr. Brandon evaluated was medical records from the period December 23, 2014 to February 20, 2015. (*Id.*)

- adhere to basic standards of neatness and cleanliness;
- be aware of normal hazards and take appropriate precautions;
- travel in unfamiliar places or use public transportation; and
- set realistic goals or make plans independently of others.

(*Id.*) In short, the reviewers concluded that Claimant "can interact appropriately with the public and supervisors on at least a superficial level." (*Id.* at 75.) Therefore, the reviewers concluded that Claimant can "adjust to changes in the workplace with supervision." (*Id.*) The ALJ gave these opinions significant weight because she found them supported by Claimant's "activities of daily living, fairly normal mental status evaluations, only mild findings during appointments with her treating psychiatrist, and improvement with medications." (*Id.* at 21-22.)

The Court finds that Claimant's ability to complete simple household chores, in spite of being distracted; make daily meals in a crockpot; do laundry; and sometimes care for her grandson do not automatically support the conclusion that Claimant has the ability to set realistic goals or make plans independently in a work setting. The Eighth Circuit has repeatedly held that a claimant's ability to perform household chores in a safe and structured home environment does not necessarily mean she can perform gainful work activity outside the home. *See Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008) (holding that daily activities of "washing a few dishes, ironing one or two pieces of clothing, making three or four meals each week, and reading" were not inconsistent with claimant's claim of pain or with an inability to hold a fulltime job); *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007) (holding that claimant's ability to fold laundry, shop once a week, watch her children at independent play, drive short distances about three times a month, and watch television and listen to music before dozing off or losing concentration did not mean she had the ability to work fulltime); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 2003) ("This court has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial

evidence that he or she has the functional capacity to engage in substantial gainful activity.") (citing *Hogg v. Shalala*, 45 F.3d 276, 278 (8th Cir. 1995)). In short, a claimant need not prove her disability renders her "bedridden" or unable to engage in "all productive activity" before she qualifies for benefits. *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999); *Baumgarten v. Chater*, 75 F.3d 366, 369 (8th Cir. 1996).

Claimant is sometimes so depressed or anxious she cannot get out of her bedroom for much of the day. (AR at 42, 240, 335, 358.) Even in her home environment, she still reports being easily distracted and having trouble handling the stress of family interactions. (*Id.* at 41-42, 45, 359, 366-67, 374-75.) As discussed above, Claimant's inability to tolerate crowds and to appear in public is well-documented. (*Id.* at 38, 231, 239, 319-20, 335, 359-62, 366-68, 376, 380, 383.) The fact that Claimant has not been actively suicidal and that she has not had severe concentration difficulties or difficulty communicating during her one-on-one sessions with her mental health care providers does not mean she can function outside of the highly-restricted home setting.

As also previously noted, the record documents only two times that Claimant left the house socially: the Las Vegas trip and her date with her boyfriend. Both occurred approximately two years before the hearing. (*Id.* at 335, 381) Claimant required extra medication to tolerate anxieties before the Las Vegas trip and a medication change after she returned home. (*Id.* at 318-19, 335.) Since the March 2015 date, Claimant has not voluntarily left her home other than to attend appointments with health care professionals or shop for groceries—mostly after midnight to avoid people. If she must go out during the day, she has a family member accompany her. (*Id.* at 234.)

A proper analysis of the C1 criteria may have resulted in a conclusion favorable to Claimant. The Court finds that the ALJ's findings, considered in light of the record as a whole, are insufficient to permit the Court to conclude that substantial evidence

supports the ALJ's decision. The case must be remanded for a proper analysis of the entire record to determine if the C1 criteria are satisfied.

### c. C2 Criteria

The C2 criteria are satisfied when the evidence shows that, despite diminished symptoms and signs, a claimant has only achieved marginal adjustment. This means, among other things, that she has "minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(G)(2)(c). In addition, a claimant will have achieved only marginal adjustment when the evidence shows

> that changes or increased demands have led to exacerbation of [her] symptoms and signs and to deterioration in [her] functioning: for example, [she has] become unable to function outside of [her] home or a more restrictive setting, without substantial psychosocial supports. . . . Such deterioration may have necessitated a significant change in medication or other treatment.

*Id.* (internal citation omitted). The Commissioner argues (1) that Claimant has not developed an argument contesting the weight the ALJ gave to the opinions of the reviewers, as opposed to the opinion of Dr. Weldon; (2) that Claimant has achieved more than marginal adjustment because she left her job in 2013 to help her daughter, which exhibited an ability to adapt to change; and (3) she enjoyed her 2015 Las Vegas trip, which demonstrated an ability to enjoy a change in her environment. (Doc. 22 at 8.)

First, the Court finds that Claimant has not waived arguments related to the weight attributed to the opinions of Dr. Weldon and the reviewers. Claimant organized her brief so that arguments regarding Dr. Weldon's opinion are in the next section of the brief. (*See* Doc. 21 at 12-23.)

Second, the Commissioner fails to explain how Claimant's leaving her job in 2013 to help her family is evidence of adaptability. As the Court sees it, the theory of

Claimant's case is that, except in very limited circumstances, she can only spend time at home with family. Thus, this argument is without merit.

Third, the real issue regarding the C2 criteria is whether taking a single trip evidences Claimant's ability to adapt to changes in her environment. Although Claimant expressed some measure of enjoyment, her anxiety was so heightened by the experience that she had to change her medications. Moreover, as previously discussed, the record as a whole demonstrates that Claimant is "terrified" and sometimes has panic attacks when in public. (AR at 231, 359-62, 366-68, 376.) Claimant is unable to function around new people and has radically limited her life so that she avoids the general public whenever possible.

In conclusion, the Court finds that in spite of being under a psychiatrist's care for more than two years, being compliant with her medications, and being willing to change medications when current dosages and combinations are not working (*Id.* at 318, 320, 335, 358-68, 372, 374, 376, 378, 380), a proper C2 analysis may have shown that Claimant has only achieved "minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." A proper analysis of the C2 criteria may have resulted in a conclusion favorable to Claimant.

The Court finds that the ALJ's findings, considered in light of the record as a whole, are insufficient to permit the Court to conclude that substantial evidence supports the ALJ's decision. The case must be remanded for a proper analysis of the entire record to determine if the C2 criteria are satisfied.

**B.** **The claim must be remanded to properly evaluate the opinion of Dr. Weldon at step 4.**

Dr. Weldon has been Claimant's treating psychiatrist since October 10, 2014. Between October 2014 and November 2016, Dr. Weldon saw Claimant on 23 occasions. (AR at 318, 320-25, 334-35, 358-68, 370, 372, 374, 376, 378, 380.) On October 10,

2014, Dr. Weldon diagnosed Claimant as having major depressive disorder, recurrent, moderate to severe, with seasonal variation; generalized anxiety disorder; probable PTSD; and probable dysthymia.[8] (*Id.* at 325.) On February 20, 2015, Dr. Weldon changed her diagnosis from "probable PTSD" to "PTSD." (*Id.* at 334.) Dr. Weldon continued to try to rule out dysthymia[9] from November 21, 2014 to October 12, 2015, when she concluded that Claimant did not have dysthymia. (*Id.* at 318, 320, 334-35, 367-68, 372, 374, 376, 378, 380.) Claimant's diagnoses have otherwise remained consistent.

In her January 25, 2017 opinion, Dr. Weldon opined that Claimant's attention and concentration are markedly impaired based on the severity of her anxiety and depression because Claimant has "difficulty focusing on things such as TV and reading." (*Id.* at 382.)

In that same statement, Dr. Weldon also opined that Claimant's anxiety is so severe that her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances would be significantly limited, and that Claimant's anxiety is so severe "under normal conditions," that Dr. Weldon doubted Claimant would "tolerate the stress of starting a new job." (*Id.* at 382-83.) Dr. Weldon explained that Claimant often will not leave her home; that it "has been a struggle for her to tolerate the anxiety she experiences when coming to [doctor] appointments once a month;" and that Claimant shops only when she has to and "goes in the middle of the night to avoid people." (*Id.* at 383.)

Finally, Dr. Weldon opined that although Claimant could interact superficially with authority figures and could tolerate very minor changes in a work setting, she would

---

[8] Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not. . . ." *Stedman's* at 602.

[9] Dr. Weldon's notes say, "R/O dysthymia." "R/O" is a medical abbreviation for "Rule out." *Id.* at 1702.

be overwhelmed by any criticism from authority figures or any significant changes in a work environment. (*Id.*) Dr. Weldon also noted that Claimant interacted appropriately with the staff at Dr. Weldon's clinic. (*Id.*)

The ALJ afforded Dr. Weldon's opinion little weight because it was "inconsistent with her own treatment notes, which show improvement with medications and only mild findings on multiple mental status evaluations." (*Id.* at 22.)

### i. *Legal Standard*

"'A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record as a whole."[10] *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quotation omitted). "Even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (citation and bracket omitted). However, a treating physician's opinion can be given limited weight if it contains only conclusory statements, contains inconsistent opinions "that undermine the credibility of such opinions," is inconsistent with the record, or if other medical opinions are supported by "better or more thorough medical evidence." *Id.* (citations omitted). An ALJ must "give good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); *Walker v. Comm'r, Soc. Sec. Admin.*, 911 F.3d 550, 554 (8th Cir. 2018) (remanding case to the ALJ for further proceedings because ALJ "simply ignore[d]" treating physician's opinion). A proper evaluation of a physician's opinion requires consideration of the following factors: (1) examining relationship, (2) treatment relationship,

---

[10] Under current regulations, a treating physician's opinion is entitled to no special deference. *See* 20 C.F.R. § 404.1520c(c). These regulations were effective as of March 27, 2017. 20 C.F.R. § 404.1527. However, Claimant's claim was filed on November 19, 2014, so the old regulations apply. *See id.*

(3) supportability, (4) consistency, (5) specialization, and (6) other factors.[11] 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c).

### ii.   Analysis
#### a.   Examining Relationship

"Generally, [ALJs] give more weight to the medical opinion of a source who has examined [a claimant] than to the medical opinion of a medical source who has not examined [a claimant]." 20 C.F.R. § 404.1527(c)(1).  Dr. Weldon is Claimant's treating psychiatrist and examined her 23 times over two years.  In general, her opinion should be entitled to more weight than the opinions of the reviewers who did not examine Claimant.

#### b.   Treatment Relationship

"Generally, [ALJs] give more weight to the medical opinions from [a claimant's] treating sources. . . .  When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the source's opinion more weight than . . . if it were from a nontreating source." *Id*. at § 404.1527(c)(2)(i).  In addition, "the more knowledge a treating source has about [a claimant's] impairment(s), the more weight the [ALJ] will give the source's opinion." *Id*. at § 404.1527(c)(2)(ii).  As discussed, Dr. Weldon is Claimant's treating source.  Claimant saw Dr. Weldon approximately every month during the period documented in the record.  In addition, Dr. Weldon has treated Claimant for her mental health issues, exclusively, during this 25-month period, and therefore Dr.

---

[11] "Other factors" can include information claimants or others bring to the Social Security Administration's ("SSA") attention, or of which it is aware, which tend to support or contradict a medical opinion. "For example, the amount of understanding of [SSA] disability programs and their evidentiary requirements that a medical source has, regardless of the source of that understanding, and the extent to which a medical source is familiar with the other information in [a claimant's] case record are relevant factors that [SSA] will consider in deciding the weight to give to a medical opinion." 20 C.F.R. § 404.1527(c)(6).

Weldon's opinion should be given increased weight. *See Shontos v. Barnhart*, 328 F.3d 418, 426-27 (8th Cir. 2003) (reversing decision of the ALJ because ALJ did not give controlling weight to opinions of treating mental health providers who saw claimant frequently enough to gain "longitudinal picture" of claimant's impairment over the course of fifteen months).

### c. *Supportability*

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). Dr. Weldon based her conclusions that Claimant's "attention and concentration are markedly impaired" on the "severity of [Claimant's] anxiety and depression," and gave an example of Claimant's "difficulty focusing on things such as TV and reading." (AR at 282.) Dr. Weldon supported her conclusion that Claimant could not attend a fulltime job by stating that Claimant's "anxiety is so severe that she often will not leave her home," noting that "[i]t has been a struggle for her to tolerate the anxiety she experiences when coming to appointments once a month. Her anxiety is so severe under normal conditions, I doubt she would tolerate the stress of starting a new job." (*Id*. at 383.) Dr. Weldon went on to note that Claimant only goes to the store alone "in the middle of the night to avoid people." (*Id*.)

Claimant argues that these explanations are consistent with Dr. Weldon's treatment notes and would have weighed in favor of giving increased weight to Dr. Weldon's opinion, had the ALJ conducted a proper analysis. The Commissioner responds that the ALJ properly weighed the relevant factors, and properly concluded that substantial evidence supports the ALJ's decision to give Dr. Weldon's opinion little weight. (Doc. 22 at 11.)

The Court finds that the ALJ did not weigh the relevant 20 C.F.R. § 404.1527(c) factors. Indeed, the ALJ's entire discussion of what weight to assign to Dr. Weldon's

opinion is quoted above, but bears repeating: "I give Dr. Weldon's assessment little weight as it is inconsistent with her own treatment notes, which show improvement with medications and only mild findings on multiple mental status evaluations." (AR at 22.) At most, this statement addresses this factor, supportability, but no other factor. Insofar as the statement addresses this factor, it neither cites specific pages of the record that support the ALJ's conclusion nor documents how Claimant's conditions improved with medication.

The Commissioner argues that during her sessions with Dr. Weldon, Claimant consistently exhibited "linear and goal-directed thought process, good insight and judgment, intact memory, normal interaction, calm and cooperative behavior, good eye contact, and grossly intact attention." (Doc. 22 at 11) (citing AR at 301, 320-21, 324, 329-31, 334, 346, 348-49, 361, 364-66, 368-69, 370-73, 376, 380-81.) In addition, the Commissioner asserts that Claimant's symptoms were usually improved with treatment and medications. (Id. at 12-13) (citing AR at 300-01, 318, 320, 334-35, 348, 358-59, 367-73, 376, 380.) The Commissioner avers that Claimant experiences only "situational stressors," which do not rise to the level of disability. (Id. at 11-12 (citing AR at 300 (anniversary of Claimant's miscarriage); 371 (Claimant struggling with her mother's death); 345, 363, 365, 367, 370 (family and financial stressors)).

The Commissioner also argues that the only evidence of poor concentration in the record are Claimant's self-reports, and that treatment notes do not show Claimant is unable to function outside of her home environment. The Commissioner again cites Claimant's trip to Las Vegas as support for Claimant's ability to function outside of her home.

While Dr. Weldon's notes document Claimant's ability to communicate during her sessions, which is consistent with Dr. Weldon's opinion, Claimant's ability to carry on a conversation with her psychiatrist in a safe one-on-one setting does not negate the severity

of Claimant's other mental health issues. Claimant never claimed an inability to communicate, maintain eye contact, remain calm and cooperative, maintain good insight and judgment, linear and goal-directed thought processes, normal interaction, or grossly intact attention in her psychiatrist's office. The task of the ALJ was to determine if Claimant could successfully interact in a work-related setting on a fulltime basis, not whether Claimant could talk to her psychiatrist once a month. As discussed above, although Claimant often struggles to get out of bed, she does routinely communicate successfully in her home environment. Furthermore, the Court has already found her ability to function at home does not necessarily mean Claimant can perform fulltime work. *See supra* Section III.*A.ii.c.*

Dr. Weldon's treatment notes consistently document Claimant's severe anxiety and difficulty leaving home. (AR at 38, 231, 239, 320, 324, 334-35, 359-62, 366-68, 372, 376, 380, 383.) Furthermore, Claimant's mood is consistently "depressed and anxious," "depressed," or "anxious" during appointments with Dr. Weldon. (*Id.* at 318, 321, 324, 334, 335, 358-68, 370, 372, 374, 376, 378, 380.) As discussed above, Dr. Weldon also noted that Claimant was occasionally "fidgety," "tearful," or "slow" in her psychomotor activities (*Id.* at 320, 324, 359, 361); sometimes disheveled in her appearance (*Id.* at 335, 359, 361, 362, 363, 365, 374, 378); and had a restricted affect (*Id.* at 334, 335, 359, 361, 362, 364, 365, 366, 367, 368, 374, 376).

Although the Commissioner takes issue with the fact that Claimant's symptoms are self-reported, Dr. Weldon's treatment form contains a section where she documents a patient's "Interval History." Dr. Weldon notes Claimant's anxiety, mood, and medication compliance, among other things. (*See, e.g.*, *id.* at 360.) By design, this section must include the patient's self-report about her life since her last appointment. (*Id.*) The rest of the form contains spaces for Dr. Weldon's own "Mental Status Evaluation;" her "Suicide Risk Assessment;" her "Impression/Discussion," which is

where Dr. Weldon notes her diagnosis; and her "Plan" that includes information about medications and actions the patient might take before the next session. (*Id.*)

The Commissioner also argues that Claimant's alleged poor concentration is self-reported. Again, Dr. Weldon noted Claimant's concentration difficulties in the "Interval History" section of her treatment notes. (*Id.* at 320, 321, 334, 335, 360, 361, 362, 365, 366, 367, 368, 372, 374, 376, 378.) There is no appropriate check-box for "concentration" in Dr. Weldon's form. Dr. Weldon's notes contain no reason to doubt the self-reporting regarding concentration.

Claimant has consistently taken the medications Dr. Weldon prescribed. However, the medications seem to provide only temporary relief. Claimant's medications were changed at 19 out of 23 of her visits with Dr. Weldon because Claimant's symptoms were either not responding to treatment, were worsening, or because Claimant was not tolerating the medications well. (*Id.* at 318, 320, 335, 358, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368, 372, 374, 376, 378, 380.) Claimant testified at the administrative hearing that she has taken "all kinds of different drugs, that work for a little bit and then just seem to stop working" and that her medications were not helping her at the time of the hearing. (*Id.* at 44, 48.) With medication, Claimant's symptoms were never controlled well enough for her to interact with strangers or for her to be comfortable in public alone. Even when the symptoms improved, they would worsen again in a month or two, which is not an unusual occurrence when dealing with mental health issues. *See Nowling v. Colvin*, 813 F.3d 1110, 1123 (8th Cir. 2016) (ALJ improperly accorded great weight to treating psychiatrist's treatment notes stating that claimant showed improvement, without acknowledging his treatment notes stating that claimant's symptoms waxed and waned throughout 29 visits over five years, and without acknowledging the unpredictable nature of claimant's symptoms); *Knepper v. Astrue*,

No. 11-CV-4034-DEO, 2012 WL 4470773, at *9 (N.D. Iowa Sept. 27, 2012) ("It is a truism that mental disorders wax and wane in time.").

Thus, even though there were times when Dr. Weldon noted that Claimant experienced improvement in her symptoms, the ALJ's and the Commissioner's contention that Claimant's symptoms are well-controlled with medications is belied by the records of the only doctor who prescribed medications to Claimant.

The Court finds that the ALJ failed to properly evaluate the supportability of Dr. Weldon's opinion. This could have affected the ultimate weight the ALJ gave to that opinion. On remand, the ALJ will need to properly weigh this evidence.

### d.    Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). In support of her conclusion that the Claimant's statements regarding concentration are inconsistent with the record, the ALJ cited notes from Claimant's very first session with Dr. Weldon wherein Claimant's attention, cognition, and memory were grossly intact. (*Id.* at 20.)

As discussed above, Dr. Weldon gave an opinion regarding Claimant's concentration: her concentration is markedly impaired based on the severity of her anxiety and depression because she has "difficulty focusing on things such as TV and reading." (*Id.* at 382.) Claimant's concentration difficulties are documented in Dr. Weldon's treatment notes, one note from a session with psychologist Ms. Rogers Cork, and Claimant's own written Function Report and sworn testimony at the hearing. (*Id.* at 43, 45, 233, 236, 319, 320, 321, 334, 335, 360, 361, 362, 365, 366, 367, 368, 372, 374, 376, 378.) The reviewers found that Claimant's ability to concentrate is moderately impaired. (*Id.* at 87.) The ALJ gave the reviewers' opinions more weight than Dr. Weldon's opinion.

The ALJ's single citation to Claimant's first session with Dr. Weldon fails to account for the rest of the evidence in the record showing Claimant's concentration difficulties. In 15 out of 23 sessions, Dr. Weldon rated Claimant's concentration as "low," "poor," or "worse." (*Id.* at 320, 321, 334, 335, 360, 361, 362, 365, 366, 367, 368, 372, 374, 376, 378.) Dr. Weldon stated that Claimant's concentration problem is a result of Claimant's anxiety and depression. (*Id.* at 382.) In addition, Claimant reported getting off track while trying to do simple household chores. (*Id.* at 45, 233.)

Dr. Weldon also gave an opinion related to Claimant's anxiety issues: (1) Claimant can only interact superficially with authority figures; (2) Claimant would be overwhelmed by criticism at the workplace; and (3) Claimant would be overwhelmed by significant changes in the workplace. Dr. Weldon based these work-related opinions on the following medical conclusions: (1) Claimant's anxiety is so severe she often will not leave her home; (2) it "has [even] been a struggle for her to tolerate the anxiety she experiences when coming to [doctor] appointments once a month"; (3) to avoid people, Claimant shops only when she has to and goes in the middle of the night. (*Id.* at 382-83.) In short, Dr. Weldon opined that Claimant's anxiety is so severe "under normal conditions," that Claimant would likely not "tolerate" the stress of starting a new job." (*Id.* at 383.) Claimant's severe anxiety is documented in Dr. Weldon's treatment notes; the notes of psychologist Ms. Rogers Cork; Claimant's own written Function Report and her sworn testimony at the hearing; and Claimant's daughter's Third-Party Function Report. (*Id.* at 38, 39, 41, 231, 234, 236-37, 239, 240, 242, 245, 318, 319, 320, 321, 322, 324, 329, 330, 331, 334, 335, 358-81.)

The only evidence in the record that is contrary to these notes, statements, and testimony is the reviewers' finding that Claimant's abilities to "interact appropriately with the general public. . . . accept instructions and respond appropriately to criticism from supervisors. . . . [and] ability to respond appropriately to changes in the work setting"

are moderately limited (*Id.* at 87-88, 98-99); and that her abilities to "ask simple questions or request assistance. . . . ability to get along with coworkers or peers without distracting them or exhibiting behavior extremes. . . . ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. . . . ability to travel in unfamiliar places or use public transportation. . . . [and] ability to make plans independently of others" are not significantly limited. (*Id.*) The reviewers opined that Claimant can "interact appropriately with the public and supervisors on at least a superficial level" and can "adjust to changes in the workplace with supervision." (*Id.* at 88, 99.) The reviewers did not have the benefit of all the later medical records. The reviewers did not review at least 18 visit records with Dr. Weldon and at least nine visit records with Ms. Rogers Cork. The reviewers were working with old information, but the ALJ had the entire record. There is little support in the record for their opinions that someone whose panic attacks have worsened in the last few months of treatment; who is "terrified" of strangers and the public; and who has barely left the house during daylight hours since March 2015 can successfully travel on public transportation, interact with the public, successfully interact and behave at work, and make independent plans. The Court is convinced that there is evidence in the record that the ALJ failed to assess regarding Dr. Weldon's opinion on Claimant's anxiety. Remand is necessary for the ALJ to properly weigh all the evidence in the record related to Claimant's concentration and anxiety.

### e. *Specialization*

"[The ALJ will] generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Weldon is a board-certified psychiatrist who rendered an opinion in her area of specialty. (Doc. 21 at 21.) Therefore, the ALJ was required to credit Dr. Weldon's opinion, if it was supported by

the record.  *See Brown v. Astrue*, 611 F.3d 941, 951, 954 (8th Cir. 2010) (affirming ALJ's decision to give greater weight to opinion of claimant's treating psychiatrist than to opinion of her family physician when claim was based on mental health issues).

The Court finds that a proper review of the entire record and all of Dr. Weldon's treatment notes, rather than just select portions of those notes, would likely lead to a conclusion that her opinion is supported by the record as a whole. Therefore, Dr. Weldon's opinion should have been given more weight than the opinions of the reviewers because she rendered an opinion in her area of expertise.

### iii.    Conclusion

The Court finds that the ALJ failed to conduct a complete review of Dr. Weldon's opinion, and remand is required on this issue.  On remand, the ALJ must conduct a proper review of Dr. Weldon's opinion under 20 C.F.R. § 404.1527(c) consistent with the findings of this Court.

## C.    *The claim must be remanded to properly evaluate Claimant's subjective complaints.*

Claimant argues that the ALJ failed to properly evaluate her subjective complaints. Specifically, Claimant asserts that the ALJ did not consider all evidence in the record because she did not credit certain complaints and symptoms Claimant claims to experience.  The Commissioner responds that the ALJ properly discounted Claimant's subjective complaints only after a proper evaluation of the record as a whole because Claimant's subjective complaints were inconsistent with the record and the ALJ's symptom analysis was consistent with 20 C.F.R. Sections 404.1529 and 416.929 and *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

Specifically, the Commissioner argues that (1) Claimant's symptoms are related to situational stressors that are controlled with medications; (2) Claimant's allegations of poor memory, concentration, and being terrified of being around others and only feeling

safe at home are inconsistent with the record as a whole because Claimant's medical records show "intact attention, cognition, and memory" and that she is able to shop during the day as needed and enjoyed a night out and a vacation with her boyfriend in 2015; (3) Claimant gave inconsistent testimony regarding nightmares and flashbacks; and (4) Claimant quit working to help her daughter, not because she claimed disability; once Claimant filed for disability, she did not seek medical treatment for more than a year; and Claimant applied for work when her Social Security claim was pending. The Court will address each of the Commissioner's arguments in turn.

Under *Polaski*, the court must consider a claimant's work history, and evidence relating to the following factors when evaluating subjective complaints ("the *Polaski* factors"): "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the [claimant's] pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions." 739 F.2d at 1322. An ALJ is not required to "methodically" discuss each *Polaski* factor as long as the ALJ "acknowledge[es] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (*citing Brown v. Chater*, 87 F.3d 963, 966 (8th Cir.1996). The *Polaski* factors should be applied to claims of mental impairments as well as claims of pain. *See Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (*Polaski* used as framework for assessing disability claim based on anxiety and other mental health conditions).

As discussed above, the Commissioner's arguments related to Claimant's alleged situational stressors, concentration, and terror are not supported by the record as whole.[12]

---

[12] Contrary to the Commissioner's assertion, Claimant does not argue that she has memory issues. (Doc. 27 at 14) ("[Claimant] does not argue with the mental status findings that her cognition and memory are adequate. [Claimant] is not cognitively impaired.")

While Dr. Weldon's treatment notes do document an increase in symptoms during stressful periods in Claimant's life, as discussed above, the notes also document consistent inabilities to interact with people and problems with anxiety and depression that are not well-controlled by medications. (AR at 318, 320, 335, 358-68, 370, 372, 374, 376, 378, 380.) As of the hearing date, Claimant's medications were still not controlling her symptoms. (*Id.* at 44, 48.) As previously discussed, Claimant's ability to successfully communicate with her psychiatrist does not necessarily mean she can successfully appear in public or work fulltime. In addition, even during her sessions with Dr. Weldon, Claimant was often tearful, fidgety, slow in her psychomotor activities (*Id.* at 320, 324, 359, 361), or disheveled in her appearance (*Id.* at 335, 359, 361, 362, 363, 365, 374, 378).

Regarding Claimant's inconsistent statements about her nightmares and flashbacks, the Court agrees with the ALJ's conclusion that Claimant's allegations of flashbacks are not supported in the record as a whole. *See Lowe*, 226 F.3d at 972. Indeed, Claimant cites only Dr. Weldon's notes from her initial meeting and her own hearing testimony in support of this claim. (AR 46-47.) Therefore, the record does not document flashbacks with a duration, frequency, or intensity that supports a finding of disability based on flashbacks.

The Court likewise finds the ALJ's conclusion regarding claims about nightmares similarly supported. Claimant first told Dr. Weldon she did not have nightmares. (*Id.* at 322.) While Dr. Weldon occasionally documented nightmares in her treatment notes (*Id.* at 364, 365, 367, 380), treatment notes do not document an ongoing or persistent problem with nightmares. In this respect, the instant case is distinguishable from *Hill v. Astrue* in which the magistrate judge recommended granting the claimant's motion for summary judgment in spite of the claimant's failure to visit a doctor every time she fell down, while still reporting frequent falls in her Social Security benefits application. *See*

No. CIV. 10-4170 PJS/FLN, 2011 WL 5878356, at **12-13 (D. Minn. Nov. 7, 2011), *R. & R. adopted*, 2011 WL 5880993 (D. Minn. Nov. 23, 2011). Here, Claimant did not fail to see a doctor. On the contrary, she saw Dr. Weldon 23 times at approximately monthly intervals and was asked about her sleep at every visit. The very few documented mentions of nightmares support the conclusion that nightmares are not of a duration, frequency, or intensity that supports a finding of disability.

Finally, the Court will address the Commissioner's arguments related to Claimant's reason for quitting work, the delay between filing her claim and when she started medical treatment, and her job application. The Commissioner cites *Goff v. Barnhart* for the proposition that stopping work for reasons other than disability undermines a claimant's credibility. (Doc. 22 at 17) (citing *Goff*, 421 F.3d at 793.) The reason a claimant leaves work is but one thing a court should consider when evaluating credibility. *Id.* at 792 (citing cases and examples of activities that weighed against the claimant's credibility). Moreover, unlike Claimant in the instant case, the claimant in *Goff* was fired from her job and immediately applied for Social Security disability benefits. *Id.* at 788. Accordingly, the Court has properly considered the reasons for Claimant leaving her last job along with the entire record when reviewing the ALJ's decision.

The Court has already found that Claimant's failure to seek medical treatment before October 2014 was the result of a lack of medical insurance, not a lack of illness, and does not detract from Claimant's credibility. *See supra* Section III.*A.ii.b*.

The ALJ found that Claimant's application to work at Walmart in 2016 undermined her disability claim. (AR at 21.) However, Claimant explained that she applied for this job after her Social Security claim was denied initially and on appeal and at a time when there was very little income coming into her home. (*Id.* at 40.) Claimant also doubts that she could actually have done the work if offered the job and she never

followed up about her application. (*Id.* at 40-41.) In that way, the instant case can be distinguished from *Smith v. Colvin*, cited by the Commissioner, because the claimant in *Smith* worked for at least eight months after his alleged disability onset date and collected unemployment insurance benefits. 756 F.3d 621, 626 (8th Cir. 2014). This meant the *Smith* claimant was holding himself out as able to work. *Id.* (citing *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991), which holds that a claimant must "hold himself out as available, willing and able to work" to receive unemployment benefits). Neither circumstance occurred here.

The Court finds this single job application filed in 2016 is not determinative of the outcome of this case. The ALJ and the Court are both required to look at the entire record. This application was an apparent anomaly and not representative of Claimant's behavior in the rest of the record. The Social Security Administration allows people it has declared disabled to engage in trial work periods of up to nine months without forfeiting their disabled status. *See* 20 C.F.R. § 404.1592. Claimant has not earned that particular status. Nevertheless, the rule acknowledges that people may attempt to work even if doing so may ultimately prove impossible. Based on the record as a whole, Claimant's single job application filed during the pendency of her Social Security benefits claim was likely just such an attempt by a person who would have ultimately been unable to successfully perform the work. The record as a whole does not support the conclusion that Claimant has held herself out as able to work because she filed one job application in five years. *Contra Johnson v. Apfel*, 240 F.3d 1145, 1148-49 (8th Cir. 2001) (affirming decision of ALJ to deny benefits in part because claimant continued to look for work while his claim for Social Security benefits was pending).

Therefore, the Court finds that the ALJ's decision regarding Claimant's subjective complaints, except for her complaints of nightmares and flashbacks, is not supported by

the record as a whole. Remand is necessary for the ALJ to properly evaluate the evidence in the record related to those complaints.

## IV.    CONCLUSION

For the aforementioned reasons, the ALJ's decision is **reversed and the case is remanded for further proceedings consistent with this Order of the Court.** The ALJ is ordered to:

1. Conduct a proper analysis of the entire record to determine whether Claimant satisfies the requirements of listings 12.04 and 12.06 (B) and (C);

2. Conduct a proper review of Dr. Weldon's opinion under 20 C.F.R. § 404.1527(c) consistent with the findings of this Court; and

3. Conduct a proper review of the evidence in the record related to Claimant's subjective complaints, except for complaints related to nightmares and flashbacks.

**IT IS SO ORDERED** this 20th day of February, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa